UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| SGC LAND, LLC | CIVIL ACTION NO. 10-1778 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| LOUSIANA MIDSTREAM GAS SERVICES, CHESAPEAKE OPERATING, INC., AND CHESAPEAKE LOUISIANA, LP | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment (Record Document 112) filed on behalf of Defendants, Louisiana Midstream Gas Services, L.L.C., Chesapeake Operating, Inc., and Chesapeake Louisiana, L.P. (collectively, "Chesapeake").[1] Plaintiffs, SGC Land, L.L.C. and Smithburg, Inc., filed a Cross-Motion for Partial Summary Judgment (Record Document 113) with respect to the alleged improper location and operation of a pipeline on the property at issue. Additionally, the Plaintiffs oppose Chesapeake's Motion for Summary Judgment on all other issues. (Record Document 116). For the reasons that follow, Chesapeake's Motion for Partial Summary Judgment (Record Document 112) is hereby **GRANTED in part** and **DENIED in part**. It is further ordered that Plaintiffs' Motion for Partial Summary Judgment (Record Document 113) is hereby **DENIED**.

**BACKGROUND**

On March 7, 2008, Smithburg, predecessor-in-title to SGC, entered into an Oil, Gas

---

[1] See Record Document 112-114 at 1. Chesapeake Operating, Inc., Chesapeake Louisiana, L.P. and Louisiana Midstream Gas Services refer to themselves collectively as "Chesapeake." Accordingly, the Court will address the claims against, and the liability of, the three named parties as a single unit for purposes of the these motions.

and Mineral Lease (the "Lease") with Suncoast Land Services, Inc. covering approximately 567 acres located in Section 12, Township 13 North, Range 13 West, DeSoto Parish, Louisiana and Section 7, Township 13 North, Range 12 West, DeSoto Parish, Louisiana (the "Smithburg Property"). Record Document 112-14 ¶ 1,2; 113-12 ¶ 1. In addition to the general provisions found in the form lease, the lease contains Exhibit A which was proposed and drafted by Urban E. Smith, Smithburg's president. Record Document 112-14 ¶ 4; 113-12 ¶ 4. This exhibit contains a surface damage payment provision requiring the lessee to pay $2,000/acre for "well locations, access roads and pipeline rights of way as damages for all surface areas physically contacted by Lessee's operation on the lease premises." Record Document 112-2 ¶ 22. The exhibit also contained the following two paragraphs:

> 23. In the event the land is placed in a pooled unit or units, the leased 567.08 acres cannot be used for roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power lines or power stations, unless the well is drilled on the 567.08 acres.
>
> 26. Lessee may not use any portion of the Lessor's land leased herein for the herein leased operations or related activities unless the actual well site is located on Lessor's 567.08 acres.

Record Document 112-2 ¶ 23, 26; 112-14 ¶ 5. Suncoast subsequently assigned all of its right, title and interest in and to the lease to Chesapeake Louisiana, L.P. Record Document 113-12 ¶ 6. In February, 2009, Chesapeake spudded the Smithburg 7H No. 1 well (the "Smithburg Well") on the 567.08 acres (the "Smithburg property"). Smithburg and Chesapeake then entered into a Surface Damage Release and Grant of Surface Easement ("SDR") on March 12, 2009, which discharged and acquitted the operator of all liability for damage to a specified area within the leased property, approximately 4.11 acres in size.

Record Document 112-5. This SDR also granted an easement for the construction, operation, and maintenance of a pipeline to service the Smithburg Well referenced in the release. Id. In conjunction with the operations of the Smithburg Well, Chesapeake constructed and utilized a "frac pond," road, and a well site for parking vehicles and equipment.

Chesapeake subsequently assigned to Louisiana Midstream Gas Services, Inc. ("Midstream") its right "to construct, operate, and maintain a pipeline, rights of ingress and egress to the leased premises and all other necessary rights and purposes incident to construction, operation and maintenance of the pipeline." Record Document 112-6 at 3. However, rather than simply construct a pipeline in accordance with the rights granted to Chesapeake under the lease and subsequently assigned to Midstream, Midstream entered into an additional and separate contract with Smithburg on July 22, 2009. Record Document 112-7. This contract, labeled "Easement and Right of Way Agreement," allowed for the installation of a pipeline across a specified portion of the property with no restrictions preventing or limiting the pipeline from being used to transport third-party gas. Id. Furthermore, based upon the email correspondence between Midstream and Smithburg, it is clear that this easement was executed to ensure that the Midstream was permitted to flow third-party gas through the pipeline. Record Document 113-11 at 3. Accordingly, Midstream built the pipeline and subsequently transmitted gas from both the Smithburg Well and the "Allen Well" (HA RC SUAA; Allen 18-13-12-H No. 1 Well, Serial No. 241015) through the pipeline. Record Document 113-12 ¶ 15-17. The Allen Well is not located on the leased property and/or properties unitized with the Smithburg property governed by the lease. Id. By its own admission, Midstream constructed a portion of the pipeline outside

of the agreed upon Right of Way (less than 30 feet of the pipeline was constructed no more than 4.4 feet outside of the designated area.) Id. Additionally, Chesapeake has continued to use the "frac pond," road, and well site, which were built on the Smithburg property in connection with the drilling and operations of the Smithburg Well, to service the Allen Well located on the adjacent property. The Plaintiffs have filed suit alleging that despite specific limitations to the contrary, Chesapeake has, and continues to permit use of a frac pond, pipelines, and a parking area for use in servicing other wells not located on the property. Record Document 1-3 ¶ 12-16. Additionally, Plaintiffs allege Chesapeake has, without permission or right, located its pipeline outside of the agreed to right of way and trespassed upon the Plaintiffs' property. Id., ¶ 23. Chesapeake subsequently filed the instant Motion for Summary Judgment (Record Document 112) urging the Court to dismiss all claims. Plaintiffs responded by filing a Motion for Partial Summary Judgment with respect to the claims involving the improper location and operation of the pipeline at issue. Record Document 113-1 at 1.

## SUMMARY JUDGMENT

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id

---

[2]The Court notes that the amended Rule 56 requires that there be "no genuine *dispute* as to any material fact," but this change does not alter the Court's analysis. F.R.C.P. 56(a) and advisory committee's note (emphasis added). This Court considers this change to be a distinction without a difference.

(citations omitted). "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004).

The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994); Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir. 1996). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Wallace, 80 F.3d at 1048 (quoting Little, 37 F.3d at 1075); see also, S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). When the nonmovant has the burden of proof at trial, he "must come forward with evidence which would be sufficient to enable it to survive a motion for directed verdict at trial." Stults v. Conoco, Inc., 76 F.3d 651, 656 (5th Cir. 1996).

If the nonmovant can not meet this burden, then "the motion for summary judgment must be granted." Id; Little, 37 F.3d at 1076.

## LAW AND ANALYSIS

"The Lease contract is the law between the parties, defining their respective legal rights and obligations...as well as the rules for interpretation of contracts as laid down in the Civil Code." Frey v. Amoco Prod. Co., 603 So. 2d 166, 172 (La. 1992)(citations omitted).

> The purpose of interpretation is to determine the common intent of the parties. See La.Civ.Code art. 2045. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter, see La.Civ.Code art. 2047, and words susceptible of different meanings are to be interpreted as having the meaning that best conforms to the object of the contract. See La.Civ.Code art. 2048. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties. La.Civ.Code art. 2053. When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose. La.Civ.Code art. 2054.

Id. "Where the language of a contract is clear and unambiguous, it must be interpreted solely by reference to the four corners of that document." Tammariello Properties, Inc. v. Med. Realty Co., Inc., 549 So. 2d 1259, 1263 (La. App. 3d Cir. 1989). Additionally, "[a] provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code art. 2049. See Glassell v. Richardson Oil Co., 91 So. 431, 434 (La. 1922)("A construction which entirely neutralizes one provision of a written instrument should not be adopted if the

contract is susceptible of another, which gives effect to all of the provisions.")[3]

**A. Trespass**

There is no dispute that the pipeline located on the Smithburg property was constructed outside the agreed upon right of way found in the Easement and Right of Way Agreement ("Easement") between Smithburg and Midstream. However to immediately assess whether Midstream and/or Chesapeake has trespassed onto Plaintiffs' property and whether Chesapeake is required to pay a disgorgement of profits based on this breach of the Easement is premature. Given the relief sought by Plaintiffs, this Court must first resolve whether Chesapeake acted in bad faith in order to determine the appropriate remedies.

It is important to note at the outset that there are numerous complex contracts between the parties, each granting certain rights which potentially overlap with prior agreements. While the Plaintiffs' Motion for Partial Summary Judgment urges this Court to exclusively analyze the Easement and Right of Way Agreement when ruling on damages related to the pipelines improper location, it is possible that the pipeline's current location and/or operations are permitted under either the SDR or the original Lease. Even if the SDR and Lease do not authorize the pipelines current location and use, these documents are nevertheless important as evidence of whether there was honest doubt as to the rights of the parties and whether Chesapeake acted in good faith.

It is clear that the SDR grants an "easement for the construction, operation and

---

[3]The Court is aware of the recent Louisiana Supreme Court holding in <u>Clovelly Oil Co., LLC v. Midstates Petroleum Co.</u>, LLC 2013 WL 1115296, 2012-2055 (La. 3/19/13). This decision is in accord with the principles of contract interpretation cited today.

maintenance of a pipeline to service the Well."[4] This contract does not specify the exact location in which the servicing pipeline must be constructed; rather, it specifies the location of the well and leaves open the location of any servicing pipeline. Because the pipeline at issue did, in fact, service the Smithburg Well, Chesapeake was permitted to construct the servicing pipeline at its present location. However, the rights granted by the SDR are limited in that the SDR specifically grants an easement for a pipeline *servicing* the Smithburg well, but does not grant a blanket right to transport third-party gas through the pipeline. The SDR can only be used as justification for the present location of the pipeline, but cannot be used to justify its transportation of third-party gas. Accordingly, the Court shifts its analysis to the Lease, specifically paragraph 23 and 26, the clauses most relied upon by both parties in support of their motions.

    Paragraphs 23 and 26 state the following:

> 23.    In the event the land is placed in a pooled unit or units, the leased 567.08 acres cannot be used for roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power lines or power stations, unless the well is drilled on the 567.08 acres.

> 26.    Lessee may not use any portion of the Lessor's land leased herein for the herein leased operations or related activities unless the actual well site is located on Lessor's 567.08 acres.

While the mineral lease grants a broad set of rights with respect to land use by Chesapeake, paragraph 23 and 26 were added as an addendum by Mr. Smith in an effort to limit those rights. Although inartfully worded, this clause at least attempts to set

---

[4] It is clear from the context of the sentence that "the Well" is a reference to the Smithburg Well located on the 4.11 acres of Smithburg's property referred to in the contract.

parameters regarding use of the Smithburg property. Chesapeake interprets these clauses as only establishing a condition precedent, i.e., once "the well" on the Smithburg property is drilled, Chesapeake can use the Plaintiffs' property for all roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, etc. regardless of which well they service. This Court is not inclined to take such an expansive reading of the Lease. To do so would not only nullify paragraph 26, but expand its intended scope. While paragraphs 23 and 26 do create a condition precedent, a detailed reading of those clauses reveals qualifiers and limitations relevant to this dispute.

Paragraph 26 acts as a "catch all" phase, prohibiting the use of any portion of Lessor's land for the leased operations or related activities unless the actual well site is located on Lessor's 567.08 acres. Worded another way, paragraph 26 requires that use of the Smithburg property be for leased operations or related activities. While it appears that paragraph 23 permits use of the leased property to service wells located on land pooled or unitized with the leased property once the Smithburg Well had been drilled, paragraph 26 limits this right to only include those wells contemplated by the Lease. There is no dispute that the Allen Well is not located on the property and/or properties unitized with the 567.08 acres covered by the lease and therefore does not fall under the umbrella of "herein leased operations" or "related activities."

Accordingly, the pipeline's location is permitted by the Lease and SDR, but the current operations of transmitting third-party gas through the pipeline is not. Such activity is beyond the scope of the both the form mineral lease and the addendum. However, Chesapeake's misinterpretation of the condition precedent is reasonable, leading to honest doubt as to the exact meaning of paragraphs 23 and 26 in relation to the rest of the lease.

Additionally, when considering the scope of all the contracts, including the Easement and Right of Way Agreement, this violation is not nearly as serious as opined by the Plaintiffs. Midstream was both permitted to construct a pipeline anywhere on the property and permitted to transmit third party gas through the pipeline if located on a specified portion of the land. Midstream's transportation of third-party gas through the pipeline that was inadvertently constructed four (4) feet outside the right of way and did not harm Plaintiffs. This violation is more accurately classified as a breach of contract, not a trespass.

Under Louisiana law, a civil trespass is defined as the "unlawful invasion of the property or possession of another." Boudreaux v. Plaquemines Parish Gov't, 22 So. 3d 1117, 1118 (La. App. 4th Cir. 2009). As established above, Chesapeake was authorized to construct the pipeline virtually anywhere on the property in order to service any well located therein, and therefore did not unlawfully invade Plaintiffs' property with respect to the placement of the pipeline. While the Easement and Right of Way Agreement did establish a set location to place the pipeline in order for it to transport third-party gas, the Court does not believe that Chesapeake trespassed onto Plaintiffs' land when it transported third-party gas through the minor deviation in the pipeline's agreed upon path. However it is not necessary to determine whether that act of transporting third-party gas in the misplaced pipeline is a breach of contract, encroachment, or a technical trespass. Regardless of how the violation is classified, Plaintiffs are not entitled to a disgorgement of profits.

Under Louisiana law, the remedy of "disgorgement of profit" is available upon the showing of bad faith possession. See generally, Corbello v. Iowa Production Co.,

2002-0826 (La. 2/25/03), 850 So. 2d 686, (superseded by statute on other grounds as stated in State v. Louisiana Land and Exploration Co., 2012-0884 (La. 1/30/13), 6 ); La. Civ. Code art. 486. See also Rosenthal-Brown Fur Co. v. Jones-Frere Fur Co., 162 La. 403, 411, 110 So. 630, 633 (1926) ("The question whether a possessor be in good faith or in bad faith (legal or actual) is the sole factor in determining whether such possessor should or should not account for the fruits of his possession."). This doctrine stems from La. C.C. art. 486 which provides in part that a possessor in bad faith is bound to restore to the owner the fruits[5] he has gathered, or their value. See also Wagoner v. Chevron USA Inc., 45,507 (La. App. 2 Cir. 8/18/10), 55 So. 3d 12, 19 writ denied, 2010-2773 (La. 3/2/12), 83 So. 3d 1032.

      The Plaintiffs seek damages for trespass, including disgorgement of profits for transmitting third-party gas through the pipeline. Record Document 113-1 at 12. This Court must stress that, despite repeated arguments to the contrary, Plaintiffs have failed to satisfy the sole determining factor in a disgorgement of profits claim. The Plaintiffs have not presented any evidence showing legal bad faith on the part of Midstream/Chesapeake in the construction or operation of the pipeline. Midstream specifically negotiated an agreement with the Plaintiffs for the sole purpose of transporting third-party gas and attempted to construct the pipeline in accordance with such. While Plaintiffs place great weight on the fact that Mr. Smith informed Midstream that the "pipeline route was being surveyed outside of the agreed upon right of way," the minor variation in the pipeline's

---

[5]La. C.C. art. 551 defines fruits as things that are produced by or derived from another thing without diminution of its substance; Article 551 further specifies that civil fruits are revenues derived from another thing, such as rentals, interest, and certain corporate distributions.

actual location was in an entirely different area than that complained of by Mr. Smith during the surveying. See Record Document 118-2. Furthermore, the Plaintiffs have not provided any evidence demonstrating any advantages, financial incentives, or profits which would motivate the deviation of four feet from the agreed upon right of way. Chesapeake did not receive any additional profits attributable to placing the pipeline slightly outside the planned path. Ultimately, a review of the entire record reveals an inadvertent surveying mistake, not bad faith. Additionally, any mistaken interpretation stemming from paragraphs 23 or 26 was not unreasonable. This Court finds that no reasonable juror could find that Chesapeake, specifically Midstream, acted in bad faith when constructing the pipeline and award Plaintiffs a disgorgement of profits.

The Court finds the more appropriate analysis regarding damages stems from the doctrine of encroachment found in La. C.C. art. 670:

> When a landowner constructs in good faith a building that encroaches on an adjacent estate and the owner of that estate does not complain within a reasonable time after he knew or should have known of the encroachment, or in any event complains only after the construction is substantially completed the court may allow the building to remain. The owner of the building acquires a predial servitude on the land occupied by the building upon payment of compensation for the value of the servitude taken and for any other damage that the neighbor has suffered.

Here, Chesapeake, considered landowners based on their rights acquired from both the Lease and the easement, built a structure[6] in good faith on adjacent land, without complaint by the Plaintiffs about the actual encroachment at issue prior to the pipeline being

---

[6]See Winingder v. Balmer, 632 So. 2d 408, 411 (La. Ct. App. 1994); Lakeside Nat. Bank of Lake Charles v. Moreaux, 576 So. 2d 1094, 1098 (La. Ct. App. 1991).

substantially completed. The Court finds that as a matter of law, Chesapeake is entitled to a predial servitude of the reasonable area surrounding the pipeline located outside the agreed upon right of way in which the pipeline has been constructed. However, Chesapeake is obligated to pay fair compensation for the value of this servitude.

As an added and alternative justification for today's ruling, this Court proceeds in equity under La. C.C. art. 4. Even if Midstream's construction of the pipeline did not satisfy each of the technical requirements of Article 670, no reasonable juror could find that Chesapeake, through Midstream, acted in bad faith in constructing the pipeline. There is no competent evidence in the record proving or indicating that the ultimate location of the pipeline involved bad faith. Furthermore, the Plaintiff has been unable to identify any damage suffered from the slight deviation of the pipeline outside the designated right of way. Accordingly, this Court is not inclined to resort to the harsh remedy of requiring either the destruction of the encroaching pipeline or the disgorgement of profits under the circumstances presented. Plaintiffs' Motion for Partial Summary Judgment with respect to the improper location and operation of the pipeline is denied.

### B. Abandonment

Plaintiffs also now seek a release of the Easement and Right of Way Agreement between Smithburg and Midstream based upon an alleged non-use of the pipeline between February, 2010 and mid-July, 2010, a period longer than two months. The Easement and Right of Way Agreement between Midstream and Smithburg contained the following clause entitled "Special Provisions:"

> [Midstream] agrees, that in the event of the complete non-use of said pipeline by [Midstream], its successors and assigns, **for a period of**

> **two (18) consecutive months** this Easement and right of way shall be considered abandoned and [Midstream] shall furnish at its expense, upon receipt of written request from Grantor, a release of the Easement and right of way, in which event [Midstream] shall have the right to abandon the pipeline in place or remove said pipeline.

Record Document 112-7 ¶ 12, *emphasis added*. Under Louisiana law, when the printed contract provisions irreconcilably conflict with the provisions added by the parties, the added provisions will control. Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC 2013 WL 1115296, 2012-2055 (La. 3/19/13) (citing Kuhn v. Plauche Real Estate Co., 249 La. 85, 185 So.2d 210 (1966). This rule necessarily follows from the fundamental principle that the primary goal of contract interpretation is to ascertain the intent of the parties. Id. Chesapeake has presented evidence that while the industry standard for abandonment clauses for this type of contract clause is two years, Midstream specifically shortened the non-period use to eighteen months by adding "18." See Record Document 112-1 at 15. See also Record Document 113-11. However, when changing its form contract, Midstream inadvertently left in the word "two." Id. Accordingly, the added provision, number "18," controls over the form number "2," and the Court hereby finds the non-use period is eighteen (18) months.

Additionally, courts should refrain from construing the contract in such a manner as to lead to absurd consequences. Amend v. McCabe, 95–0316 (La.12/1/95), 664 So.2d 1183, 1187; La. C.C. art. 2046. Interpreting the abandonment clause as only allowing two months of non-use before termination the agreement would lead to the absurd results. Not only would this short time period be significantly shorter than industry custom, but it would allow the Plaintiff to terminate the right of way prior to the expiration of the 90-day period provided for in the lease in which Chesapeake was entitled to restore production after a

well ceases to produce. Plaintiffs have not presented evidence of an eighteen-month period of non-use of the pipeline, and are, therefore, are not entitled to termination of the Easement and Right of Way Agreement.

### C. Use of Frac Pond, Road, and the Well site

While most of this Courts analysis has been focused on the location and operation of the pipeline, the other aspects of the Plaintiffs' complaint can be resolved under the same rationale. Chesapeake's use of frac pond, road, and well site on the Plaintiffs' property to service the Allen Well also falls under paragraph 26. As established above, Paragraphs 26 does not grant unlimited rights once the well has been drilled. However, there was reasonable and honest doubt as to the exact parameters and appropriate application and/or interpretation of paragraphs 23 and 26.

### 1. Dissolution of the Lease

Under Louisiana law, the "right to dissolve a lease is subject to judicial control according to the circumstances." Walker v. Chesapeake Louisiana, L.P., 440 F. App'x 254, 256 (5th Cir. 2011) (citing Sieward v. Denechaud, 120 La. 720, 728, 45 So. 561, 564 (1908). "Judicial control is an equitable doctrine by which the courts will deny cancellation of the lease when the lessee's breach is of minor importance, is caused by no fault of his own, or is based on a good faith mistake of fact." Id. (citing W. Sizzlin Corp. v. Greenway, 821 So.2d 594, 601 (La.Ct.App.2002). Louisiana courts have interpreted the "good faith mistake defense" to include "honest doubt" as to the rights of the parties under a lease or when technically in default when there is a bona fide defense. Rudnick v. Union Producing Co., 209 La. 943, 949, 25 So. 2d 906, 908 (1946). It is also is clear that Louisiana jurisprudence does not favor lease cancellation. Id. (citing Carriere v. Bank of Louisiana,

95-3058 (La. 12/13/96), 702 So. 2d 648, 653). In light of these factors, dissolution of the present Lease is not warranted. While Chesapeake was in technical default when they serviced the non-unitized Allen Well using the Smithburg property, this default was based on a good faith mistake and honest doubt as to the rights of the parties.

As stated previously, Paragraphs 23 and 26 were inartfully worded. These paragraphs did, in fact, create a condition precedent in which it was permissible for Chesapeake to use the Smithburg property to service other wells after the Smithburg Well was drilled. Mr. Smith, the party who drafted Paragraphs 23 and 26, did not include a clause limiting the Smithburg property to "exclusively service" only those wells located on said property. Accordingly, the limitations of the condition precedent were unclear, and this Court hereby finds that there was honest doubt as to the rights of the parties under the Lease. Furthermore, any breach described here by Plaintiffs was and is of minor importance. Not only has Mr. Smith failed to testify as to any damage to his property, but the frac pond, roadway, and well site parking area were already rightfully constructed in connection with the servicing of the Smithburg Well. The Plaintiffs have not submitted evidence demonstrating that the continued use of these property features significantly harmed Plaintiffs or altered the nature of the property.

### 2. Disgorgement of Profits

Plaintiffs are also not entitled to a disgorgement of profits stemming from use of the Smithburg property to service the Allen Well. As discussed *ad nauseam*, Plaintiffs' have clearly failed to establish that Chesapeake was a bad faith possessor of the property. It is also doubtful as to whether Plaintiffs could establish that Chesapeake has gained an economic benefit which qualifies as a civil fruit under La. C.C. art. 551. See Wagoner v.

Chevron USA Inc., 45,507 (La. App. 2 Cir. 8/18/10), 55 So. 3d 12, 19. As in Wagoner, nothing was produced by or derived from the property as a result of its use, and there were no revenues, such as rentals, interest or a corporate distribution, derived from the property. Any substance or revenue that was produced was not derived from the Smithburg property, but was rather derived from the adjacent property.

In its opposition to Chesapeake's Motion for Summary Judgment, Plaintiffs place great weight on the fact that Mr. Smith is not an attorney and does not know what legal damages he may be entitled to under Louisiana law. Record Document 116 at 20. This statement is correct. However, this Court has rejected Plaintiffs' claim for legal damages under Louisiana trespass law, such as disgorgement of profits or a termination of the lease, leaving available only those actual damages to Plaintiffs' property. However, Mr. Smith has failed to testify as to what those damages are. Any change to the surface of Plaintiffs property was already rightfully made under the lease to drill and service the Smithburg Well. Continued use of those features on the Smithburg property did not appear to result in harm to the Plaintiffs. Accordingly, this Court finds that Chesapeake's prior breach of contract constitutes a "good faith mistake" as to their rights stemming from the Lease, and Plaintiffs are not entitled to damages based on this past use of the Leased property.

## CONCLUSION

The Court finds that the Chesapeake and/or Midstream did not trespass onto Plaintiffs' land when it constructed and operated the pipeline which serviced both the Smithburg and Allen Wells. While the pipeline's location deviated by approximately four feet from the Easement and Right of Way Agreement, its location was permitted per the Lease and SDR. The flow of third-party gas is more akin to encroachment, or breach of

contract, rather than trespass. However, irrespective of the exact nature of the violation, Plaintiffs have not demonstrated bad faith on the part of Chesapeake. Not only was the deviation from the right of way inadvertent, but there was honest doubt as to the exact parameters of paragraphs 23 and 26 with respect to servicing other wells.

Furthermore, there is no evidence that Chesapeake acted in bad faith when it used the frac pond, road, and well site to service the adjacent well. There was honest doubt as the parties' right to use existing structures to service adjacent wells under the lease. The frac pond, road, and well site where rightfully constructed in accordance with Chesapeake's right to service the Smithburg Well, and Plaintiffs have also failed to demonstrate any damages to the Smithburg property stemming from Chesapeake's continued use of the property to service the Allen well. Plaintiffs are not entitled to a disgorgement of profits related to the pipeline, frac pond, road, or well site. The Plaintiffs are also not entitled to a termination of the Lease or the Easement and Right of Way Agreement. Finally, Chesapeake is not required to pay damages for its past use of the Smithburg property in connection with servicing the Allen Well, with the exception of the value of predial servitude and other actual damages that Plaintiff has suffered stemming from the construction of the pipeline outside the agreed upon right of way. However, Plaintiffs have not submitted any evidence on the matter as to the extend of those actual damages.

Accordingly,

**IT IS ORDERED** that Chesapeake's Motion for Summary Judgment (Record Document 112) be and hereby is **GRANTED** and all claims against Louisiana Midstream Gas Services, L.L.C., Chesapeake Operating, Inc., and Chesapeake Louisiana, L.P. are

**DISMISSED** in all respects with the exception of actual damages to Plaintiffs' property as they relate to the predial servitude.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Record Document 113) be and hereby is **DENIED**. An Order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in chambers, Shreveport, Louisiana on this 28th day of March, 2013.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE